Maisto v State of New York (2021 NY Slip Op 03350)





Maisto v State of New York


2021 NY Slip Op 03350


Decided on May 27, 2021


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered:May 27, 2021

528550

[*1]Larry J. Maisto et al., Appellants,
v
State of New York, Respondent.

Calendar Date:February 11, 2021

Before: Garry, P.J., Egan Jr., Lynch, Clark and Pritzker, JJ.


DeGraff, Foy & Kunz, LLP, Albany (George J. Szary of counsel) and The Biggerstaff Law Firm, LLP, Slingerlands (Robert E. Biggerstaff of counsel), for appellants.
Letitia James, Attorney General, Albany (Robert M. Goldfarb of counsel), for respondent.
Law Office of Michael A. Rebell, New York City (Michael A. Rebell of counsel), for Center for Educational Equity and others, amici curiae.
New York Civil Liberties Union Foundation, New York City (Stefanie D. Coyle of counsel), for New York Civil Liberties Union, amicus curiae.


Lynch, J.
Appeal from an order and judgment of the Supreme Court (O'Connor, J.), entered January 16, 2019 in Albany County, upon a decision of the court in favor of defendant.
This appeal calls upon us to determine whether defendant has satisfied its constitutional obligation to provide students in eight economically disadvantaged school districts with the opportunity for a sound basic education (see NY Const, art XI, § 1). Two fundamental principles guide our review: all children are entitled to the opportunity for a "sound basic education" and all children can learn when given that chance (Campaign for Fiscal Equity v State of New York, 100 NY2d 893, 902, 915 [2003] [internal quotation marks and citation omitted] [hereinafter CFE II]).
This case comes to us for a third time (154 AD3d 1248 [2017]; Hussein v State of New York, 81 AD3d 132, 137 [2011], affd 19 NY3d 899 [2012]), and we begin with an overview of the pertinent legal principles. As the Court of Appeals has instructed, we are obliged to "decide this case on the record before us," without regard to initiatives taken subsequent to the academic years in question (Campaign for Fiscal Equity v State of New York, 100 NY2d at 927). NY Constitution, article XI, § 1 (hereinafter the Education Article) requires the Legislature to "provide for the maintenance and support of a system of free common schools, wherein all the children of this state may be educated" (see Paynter v State of New York, 100 NY2d 434, 439 [2003]). Although this provision does not guarantee equality in educational offerings (see Board of Educ., Levittown Union Free School Dist. v Nyquist, 57 NY2d 27, 47 [1982], appeals dismissed 459 US 1138, 1139 [1983]), it requires defendant to place within the reach of all students the opportunity for a sound basic education (see Campaign for Fiscal Equity v State of New York, 100 NY2d at 915; Campaign for Fiscal Equity v State of New York, 86 NY2d 307, 316 [1995] [hereinafter CFE I]; see also Campaign for Fiscal Equity, Inc. v State of New York, 8 NY3d 14, 20 [2006] [hereinafter CFE III]). A sound basic education consists of a "meaningful high school education" (Campaign for Fiscal Equity v State of New York, 100 NY2d at 914) — one which teaches skills "fashioned to meet [the] practical goal [of] meaningful civic participation in contemporary society" (id. at 905). As explained by Judge Levine in his concurring opinion in CFE I, this state has an over "200-year tradition of a dual system of financing public education," which confers upon defendant a financing obligation and provides local school districts with "broad autonomy in making policy decisions on the quality and quantity of education and the funding thereof for their respective schools" (Campaign for Fiscal Equity v State of New York, 86 NY2d at 326 [Levine, J., concurring]). Under this constitutional structure, defendant's obligation is to assure at least minimally acceptable facilities and services (see id.). This obligation [*2]takes on a heightened status in economically distressed school districts such as the ones at issue here.
Establishing a violation of the Education Article requires a multi-part showing. First, a litigant must demonstrate that defendant has provided inadequate inputs — such as physical facilities, instrumentalities of learning and teaching instruction — which has, in turn, led to deficient outputs, such as poor test results and graduation rates (see New York Civ. Liberties Union v State of New York, 4 NY3d 175, 181 [2005]; Campaign for Fiscal Equity v State of New York, 100 NY2d at 908-909; Campaign for Fiscal Equity v State of New York, 86 NY2d at 317).[FN1] Next, "a causal link between the present funding system and any proven failure to provide a sound basic education" must be shown (Campaign for Fiscal Equity v State of New York, 86 NY2d at 318). Such a nexus may be established "by a showing that increased funding can provide better teachers, facilities and instrumentalities of learning[,] . . . together with evidence that such improved inputs yield better student performance" (Campaign for Fiscal Equity v State of New York, 100 NY2d at 919 [internal citation omitted]). Proof that a school district or its board of education has mismanaged its resources is no defense to an otherwise established Education Article claim, as school districts are agents of defendant (see id. at 922).
With these principles in mind, we begin our discussion. As set forth in our prior decision, when this declaratory judgment action was commenced in 2008, plaintiffs were parents of minor students in multiple small city school districts outside of New York City (154 AD3d at 1248).[FN2] Plaintiffs seek, among other relief, declarations in their favor under the Education Article as it relates to school aid funding levels. As relevant here, the third amended complaint references defendant's failure to fully implement Foundation Aid [FN3] — an education funding program enacted by the Legislature in 2007 in response to the decisions in CFE I, CFE II and CFE III — and alleges that defendant had not appropriated sufficient funds to enable the subject school districts to offer students a sound basic education.[FN4] As we previously noted, a claim based solely on a reduction in Foundation Aid would be insufficient to establish a constitutional violation (id. at 1252; see Aristy-Farer v State of New York, 29 NY3d 501, 513-514 [2017]). Here, however, plaintiffs made district-wide allegations of inadequate inputs, deficient outputs and causation (154 AD3d at 1252).[FN5]
A lengthy bench trial ensued, following which Supreme Court (O'Connor, J.) dismissed the third amended complaint.[FN6] We reversed that determination, finding that the court had not conducted the analysis established in CFE I and CFE II (154 AD3d at 1254-1255). We remitted the matter to Supreme Court with a directive to issue a decision "setting forth its findings of fact with respect to inputs and causation for each of the school [*3]districts at issue and for entry of a declaratory judgment on each of the relevant causes of action asserted in the third amended complaint" (id. at 1255).[FN7] In doing so, the court was to analyze "the quality of teaching instruction, the adequacy of school facilities and classrooms and the availability of appropriate instrumentalities of learning, including classroom supplies, textbooks, libraries and computers" (id. [internal quotation marks and citation omitted]). Consideration was to be given to whether "class sizes must be reduced and whether additional supplemental services — for example, academic intervention services, language services, extended learning opportunities or additional social workers — must be provided to enable students in each of the districts to attain a sound basic education" (id.; see generally Aristy-Farer v State of New York, 29 NY3d at 514-515; Campaign for Fiscal Equity v State of New York, 100 NY2d at 915). In the event that the court found that inputs were insufficient, it was required to "determine — on a district-by-district basis — whether plaintiffs have established causation by showing that increased funding can provide inputs that yield better student performance" (154 AD3d at 1255). On remittal, Supreme Court found that the inputs in all of the districts were constitutionally adequate, thereby obviating the need for a causation analysis. Plaintiffs appeal.
Initially, we must recognize the enormity of the task at hand — which required evaluation of, among other things, over 5,000 pages of trial testimony and 30 boxes of exhibits — and commend Supreme Court for undertaking this voluminous review. Defendant urges us to defer to Supreme Court's factual findings and credibility determinations, while plaintiffs counter that a de novo review is warranted. In reviewing a judgment after a nonjury trial where the record is sufficient to support a dispositive determination, this Court "has virtually plenary power to 'render the judgment it finds warranted by the facts'" (Baba-Ali v State of New York, 19 NY3d 627, 640 [2012], quoting Northern Westchester Professional Park Assoc. v Town of Bedford, 60 NY2d 492, 499 [1983]; see Weckstein v Breitbart, 111 AD2d 6, 8 [1985]; Brooks v State of New York, 68 AD2d 943, 944 [1979]). Although deference to the trial court's credibility assessments may be appropriate in many circumstances (see Serrano v State of New York, 179 AD3d 1357, 1358 [2020], lv denied 35 NY3d 914 [2020]; JPMorgan Chase Bank N.A. v Futterman, 173 AD3d 1496, 1497 [2019]; see also Northern Westchester Professional Park Assoc. v Town of Bedford, 60 NY2d at 499), we need not accord such deference where resolution of the issue does not turn on an assessment of witness credibility or where the trial court's findings are unwarranted (see J. Triple S., Inc. v Aero Star Petroleum, Inc., 141 AD3d 778, 779 [2016]; Wolf v Holyoke Mut. Ins. Co., 3 AD3d 660, 660 [2004]). For the reasons that follow, we conclude that [*4]a de novo review is warranted and that plaintiffs are entitled to a declaration in their favor.
Given the nature of the claims, in which plaintiffs have asserted that defendant failed to provide the funding necessary to provide adequate services for the at-risk student populations in the subject school districts, we cannot agree with Supreme Court's conclusion that plaintiffs' expert witnesses were not credible. Plaintiffs submitted comprehensive reports from three qualified experts — Peggy Wozniak, Stephen Uebbing and Bruce Fraser [FN8] — each of whom evaluated certain of the school districts at issue. Broadly construed, these experts opined that the districts did not have adequate inputs to provide their at-risk students with a sound basic education due to inadequate funding. The experts engaged in a lengthy review process, which included evaluating officially-reported data pertaining to the districts, interviewing district officials and, in many cases, visiting schools in the subject districts. Supreme Court declined to give the opinions of these experts "any significant weight" since they either (1) did not visit classrooms to conduct teacher observations, (2) obtained information from school district officials that occasionally conflicted with defendant's officially-reported data, (3) premised their opinions on certain "output-driven data" and not "an objective analysis of inputs as required by the caselaw" or (4) could not remember certain specifics about the subject school districts at trial.[FN9]
Upon our record review, we conclude that a wholesale rejection of these experts was unwarranted. Teacher observations were not pivotal, as plaintiffs did not challenge the quality of teaching, arguing instead that the districts lacked a sufficient quantity of teachers to meet the needs of their students. Any data discrepancies may have been cause for rejecting particular testimony, but not the entirety of the experts' opinions. Nor did plaintiffs' experts merely rely on "output-driven" data to presume that the inputs were constitutionally inadequate.[FN10] Rather, they authored detailed reports pertaining to inputs, outputs and causation and independently analyzed those factors for each district, demonstrating the need for additional inputs for the at-risk student population (see Campaign for Fiscal Equity v State of New York, 187 Misc 2d 1, 76 [Sup Ct, NY County 2001] ["at-risk students need specially tailored programs, and more time spent on all aspects of academic endeavor, in order to increase their academic achievement"], revd 295 AD2d 893 [2003], mod 100 NY2d 893 [2003]; see also Campaign For Fiscal Equity v State of New York, 295 AD2d 1, 29-30 [2002, Saxe, J., dissenting] ["the question of whether a minimally adequate education is being offered . . . cannot be answered by considering whether it would be adequate if it were being provided to a theoretical student body consisting only of privileged children. . . . (Rather,) the actual circumstances [*5]and needs of all the students must be considered"], mod 100 NY2d 893 [2003]). That an expert does not recall factual details of limited significance at trial does not undermine that expert's opinion.
We also note that Supreme Court questioned Wozniak's opinion on the positive impacts of smaller class sizes, an opinion based on, among other things, findings set forth in the Tennessee Student Teacher Achievement Ratio study — findings that were cited with approval by the Court of Appeals in CFE II and which we find persuasive. To the extent that Supreme Court suggested that more specific evidence concerning class sizes was required, it is not a plaintiff's burden "to prove that some specific number is the maximum class size beyond which children cannot learn" (Campaign for Fiscal Equity v State of New York, 100 NY2d at 912). Indeed, "[i]t is difficult to imagine what evidence could even meet a burden so formulated" (id.). In addition, plaintiffs proffered numerous qualified fact witnesses, such as school superintendents and curriculum coordinators, who gave extensive testimony regarding the insufficiency of the inputs consistent with the expert opinions. Although a trial court is generally authorized to weigh the validity of competing expert testimony, the record does not support a wholesale rejection of plaintiffs' three district-specific experts on the ground that they were not credible.
Before undertaking a district-by-district review, one core issue must be addressed concerning additional supplemental services for at-risk students and programming tailored to English Language Learners (hereinafter ELL students). Supreme Court emphasized that the districts "provide[d] instruction in all of the required subjects to all students," noting that "there [was] no deficiency in the basic offerings." The court then rejected plaintiffs' argument regarding defendant's alleged failure to fund adequate Academic Intervention Services (hereinafter AIS)[FN11] and numbers of support personnel — such as social workers and guidance counselors — characterizing more robust services and staffing levels in this regard as "aspirational goals." As for services provided to ELL students, the court found that the districts provided language services at a "basic, adequate level," but rejected the notion that additional programming was needed. The court averred that "challenges in communication such as English as a second language [hereinafter ESL] . . . can certainly provide challenges to the students in the learning environment[;] however, it is not the core mission of the educational system to repair these outside social concerns and problems." Although we agree with Supreme Court that the educational system cannot be charged with resolving all of society's problems, we believe that the services and programming in question are foundational and that the level provided was insufficient to meet student need.
Supreme Court's emphasis on the fact that the subject districts [*6]"provide[d] instruction in all of the required subjects to all students" does not account for the particular needs of the at-risk student population in these districts. Plaintiffs proffered extensive evidence that many of the districts lacked adequate AIS programming, language services and support personnel during the stipulated period. The Education Article requires defendant to offer "all children" the opportunity for a sound basic education (Campaign for Fiscal Equity v State of New York, 86 NY2d at 316 [emphasis added]; see NY Const, art XI, § 1), including those who "present with socioeconomic deficits" (Campaign for Fiscal Equity v State of New York, 100 NY2d at 915 [internal quotation marks and citation omitted]). As explained by multiple qualified witnesses, providing at-risk students with a meaningful high school education — one which provides "basic literacy, calculating, and verbal skills necessary to enable students to eventually function productively as civic participants capable of voting and serving on a jury" (Campaign for Fiscal Equity v State of New York, 86 NY2d at 316) — necessarily requires two general categories of resources: (1) a student and family support team comprised of adequate numbers of social workers, guidance counselors and parent and community liaisons; and (2) early, intensive academic interventions and extended learning opportunities. As noted by the Court of Appeals in CFE II, "all children can learn given appropriate instructional, social, and health services" (Campaign for Fiscal Equity v State of New York, 100 NY2d at 915 [internal quotation marks and citation omitted; emphasis added]). Although "[p]roof of noncompliance with one or more of the [Board of] Regents' or Commissioner [of Education's] standards may not, standing alone, establish a violation of the Education Article" (Campaign for Fiscal Equity v State of New York, 86 NY2d at 317), adequate AIS programming, language services and support personnel are relevant factors to consider when assessing the inputs portion of such a claim.
DE NOVO REVIEW
Defendant concedes that the outputs in all of the districts were inadequate during the stipulated period, and a review of the record independently supports this sad reality. For their part, plaintiffs have acknowledged that teacher quality was adequate in each district, a point that has been factored into the overall analysis. By way of an overview, it is important to recognize that the districts all had a high percentage of students classified as economically disadvantaged. Additionally, beginning in the 2010-2011 academic year, the districts did not receive a combined total of over $1.1 billion in funding slated to be issued under Foundation Aid. Correspondingly, there was a significant decrease in staffing levels during the review period, along with the elimination or curtailment of crucial services for at-risk students. Although student enrollment generally declined, there was no corresponding [*7]decrease in student need. Depending on the student population in a given district, the inadequacies involved anything from insufficient academic interventions, a dearth of other opportunities for more time on task, insufficient extended-day programming and a complete lack of social worker support. Occasionally, these inadequacies were compounded by class sizes too large to be conducive to learning, deficits in the standard curriculum, facility issues and less than minimally adequate access to reasonably current technology. When considering the foregoing — coupled with the very poor student results, the testimony that the districts would remedy the deficiencies with additional funding and the evidence that at-risk students require the aforementioned services to succeed — we conclude that plaintiffs have established a constitutional violation with respect to the at-risk student population in each of the subject school districts. Our individual analyses for each district follow.
Jamestown City School District
Background and Demographics
The Jamestown City School District is a high need, small city school district in Chautauqua County, which had between 4,800 and 4,985 enrolled students during the stipulated time frame. About two thirds of the students were economically-disadvantaged at the beginning of the 2011-2012 academic year and approximately 12% had disabilities. Reflecting its status as a high need district, Jamestown received around 75% of its annual revenue from state aid during the period reported and, between the 2006-2007 and the 2011-2012 academic years, its total per pupil instructional expenditures were far lower than the statewide average.[FN12] Jamestown was also identified as a "[f]ocus district" — an accountability designation for school districts among the bottom 10% statewide (see generally 8 NYCRR 100.18 [former (g) (2), eff. Nov. 28, 2012]).
Inputs
Generally speaking, the record supports Supreme Court's determination that Jamestown provided an adequate curriculum for the general student population, along with sufficient instrumentalities of learning and library services. Although there were some issues, the school facilities were also generally adequate, as were the class sizes. The problem, however, pertains to the inadequacy of services for the district's at-risk students. Jessie Joy, the district's director of curriculum instruction and assessment, estimated that the district eliminated around 80 positions during the five years prior to trial due to budget constraints, including between 20 and 30 teaching positions. Although Jamestown's teacher to student ratios compared favorably to statewide ratios by the 2010-2011 academic year — when the statewide ratios in this category increased across the board — plaintiffs elicited testimony from school administrators cautioning against comparing staffing ratios on a statewide basis, noting that districts with high percentages of students with disabilities, among other high [*8]need populations, often have a large number of staff that serve only that student population, leading to misleadingly low staffing ratios for the general student body.[FN13]
Given Jamestown's significant percentage of students with "challenges or difficulties," Tim Mains, the district's superintendent, testified that additional academic supports were necessary to address student performance — a sentiment shared by Wozniak. Despite the district's "desperate need" for social workers, Joy reported that not a single social worker was employed during the review period.[FN14] Laurence Spring, one of plaintiffs' experts who provided opinions of overarching applicability, explained that "[h]igh poverty schools require a ratio of students to social workers that allows these vital support staff to work with students and their families." He noted that the National Association of Social Workers (hereinafter NASW) recommends a social worker to student ratio of 1:250 for general education students or 1:50 where need is intense. Wozniak averred that at least one full-time social worker was necessary in every school in the district to address students' needs and provide outreach to families.
Jamestown also lacked enough guidance counselors, employing only 20 in the 2006-2007 academic year. That number dropped to around 15 by the 2013-2014 academic year, amounting to a counselor to student ratio of around 1:327.[FN15] Although that ratio was significantly lower than the statewide ratio, Spring explained that schools serving impoverished students require greater numbers of guidance counselors at the higher grade levels for relationship-based interventions and gang prevention, highlighting the ratio of 1:250 that was recommended by the American School Counselor Association (hereinafter ASCA). Guidance counselors also play an essential role at both the elementary and secondary levels, with kindergarten through grade 6 guidance programs designed to, among other things, encourage parental involvement and assist students who exhibit any "attendance, academic, behavioral or adjustment problems" (8 NYCRR 100.2 [j] [1] [i] [a]; see Campaign for Fiscal Equity v State of New York, 162 Misc 2d at 498). By grade 7, guidance programs also provide students with services geared toward career readiness, as well as assistance to students displaying attendance issues or struggling academically or behaviorally (see 8 NYCRR 100.2 [j] [1] [i] [b]). These services are even more critical where adequate support from social workers and school psychologists is lacking. In this regard, Wozniak reported that Jamestown's school psychologists were shared in schools throughout the district — with some schools receiving less than 0.5 days of service per week — and the district's ratio of psychologists/psychiatrists to students increased from 1:800 in the 2006-2007 academic year to 1:1227 in the 2013-2014 academic year, well above the statewide average.
The most significant deficits were reflected [*9]in the AIS offerings to students, with Joy explaining that, due to staffing shortages, the district was out of compliance with state regulations regarding AIS, even though she estimated that approximately 60% of its students were eligible to receive such services. Although state regulations generally mandated that AIS be provided to eligible students in English Language Arts (hereinafter ELA), math, science, and/or social studies, depending upon grade level and the year, Joy testified that Jamestown only offered AIS in reading in limited quantities.[FN16] Wozniak reported that not all elementary students who qualified for AIS were receiving such services, AIS was offered only once every four days at the middle school level, and instruction lasted only 20 minutes at the high school level. Moreover, according to Wozniak, some middle school teachers were not fully certified for the subject areas in which they were providing remediation. Ultimately, Wozniak concluded that there was an urgent need for at least 10 additional AIS teachers district-wide, noting that the class sizes or instructional groupings were too large. These deficiencies are particularly concerning when considering that, in the 2013-2014 academic year, only 13% of economically disadvantaged students in grades 3 through 8 scored at proficient levels on their state ELA assessments and only 15% of such students scored proficiently in math. A significant percentage of students, including half of the grade 9 students who required AIS, were not receiving intervention due to a lack of staff. Defendant's expert for Jamestown, Gregory Hunter, was aware that the district reported a need for additional AIS staffing and, notably, agreed during trial that such programming could help improve student performance. As for other services provided to at-risk students, Mains expressed a need for additional teachers to implement a reading recovery program. Despite Joy's estimate that 70% of grade 9 students were not reading at grade level, there were no reading teachers assigned to the high school due to fiscal constraints.
Turning to Jamestown's language services, Hunter concluded that "the district was committed to addressing the needs of its . . . [ELL students]," averring that "[t]he number of teachers devoted to serving Jamestown's high risk population was high." Joy, however, opined that the district's nine ESL teachers was insufficient to service its 215 ELL students — many of whom were also diagnosed with disabilities — and that the district was unable to provide the small, focused groups necessary to meet these students' individualized needs. Wozniak also noted deficiencies in this respect, reporting that some Jamestown students with limited English proficiency (hereinafter LEP) at the middle school level were not provided instruction in art, technology, library, music or health so that they could be provided language services. Moreover, according to Wozniak, there was no articulated plan [*10]for students requiring ESL services at the high school level.
As to Jamestown's students with disabilities, Wozniak observed that 25% of students in that category were also ELL students — creating an additional challenge to provide the services needed to meet both a student's Individualized Education Program (hereinafter IEP) and language needs — and concluded that there was an insufficient number of teachers certified to meet those dual needs. During the relevant period, no co-teaching or integrated model of instruction had been implemented for students with disabilities at the elementary level. Rather, these students were instructed in a resource room or a self-contained classroom.
C. Inputs Conclusion and Causation
The record reveals a lack of sufficient resources for Jamestown's at-risk student population. Jamestown had serious deficits in its academic interventions, it lacked a sufficient number of social workers or guidance counselors to meet the needs of the district's at-risk students and engage in family outreach, and it had an insufficient number of teachers who were proficient in teaching students with dual language and disability needs. As for causation, defendant maintained that the poor student outcomes stemmed from administrative mismanagement, not a lack of resources. We are unconvinced, and, as explained previously, the Court of Appeals has already rejected mismanagement as a viable defense. Similarly, although defendant proffered evidence that Jamestown declined to apply for a series of grants that could have secured additional resources, it was not plaintiffs' burden to "eliminate any possibility that other causes contribute[d] to th[e] failure" to offer a sound basic education (Campaign for Fiscal Equity v State of New York, 100 NY2d at 923). The record reflects that Jamestown lacked the benefit of over $109.3 million in funds that it was slated to receive if Foundation Aid had been phased in as planned and the Gap Elimination Adjustment (hereinafter GEA) had not been implemented.[FN17] Joy and Mains repeatedly testified that the deficiencies in the educational inputs stemmed from a lack of sufficient resources and that the district could remedy the deficiencies with increased funding. Wozniak also noted a causal link between the budget cuts and the decrease in essential staff and services. In light of the foregoing, plaintiffs have demonstrated the requisite causal link and, accordingly, a constitutional violation with respect to the at-risk students in Jamestown during the period under review.
II. Kingston City School District
Background and Demographics
The Kingston City School District is a small city school district in Ulster County, which had between 6,383 and 7,363 students enrolled in its schools during the review period. In the later school years, between 42% and 56% of students were eligible for free or reduced-price lunch and 17% to 22% had disabilities. Kingston was designated as average need during [*11]the stipulated period, and the district relied on state aid for only 35% of its annual revenue during the period reported. With certain exceptions, Kingston's total per pupil instructional expenditures were generally consistent with or slightly above statewide expenditures between the 2006-2007 and the 2011-2012 academic years. Like Jamestown, Kingston was designated as a focus district due to the underperformance of certain of its students.
Inputs
The record supports Supreme Court's findings with respect to the adequacy of the curriculum and services provided to Kingston's general student population. The instrumentalities of learning and class sizes in the district were also generally sufficient. Again, the issue centers on the offerings provided to at-risk students. Although Kingston was among the better of the districts in terms of its supports for this student population, the record still reflects significant deficiencies. To that end, Paul Padalino, the district's superintendent, detailed cuts that the district made to close a significant budget gap caused by the subject state aid shortfalls. He testified that, for the 2011-2012 academic year, the district closed an elementary school, laid off 25 to 30 employees, eliminated further positions through attrition and made various programming cuts. Additional cuts were made the next academic year to avoid "go[ing] over the fiscal cliff," with the district closing three more elementary schools and laying off around 115 full-time equivalent positions, including teachers, administrators, hall monitors and security personnel. The data generally confirms Padalino's testimony, revealing a reduction of around 17% in total professional staff positions — including paraprofessional staff — during the review period. As with Jamestown, the student to teacher ratios compared favorably with statewide averages by the 2010-2011 academic year. However, as noted above, such a comparison does not account for student need in high need districts.
As to the district's support personnel, from the 2006-2007 through the 2010-2011 academic years, Kingston had a guidance counselor to student ratio of around 1:500 (with certain fluctuations) — double that of the statewide ratio and the ratio recommended by the ASCA. The district's ratio in this category decreased to 1:425 by the 2013-2014 academic year and was much lower than the statewide ratio at that time. Nevertheless, it was still too high for this district, particularly in light of the other inadequacies and the 13% dropout rate that year. Padalino testified that, at the time of trial, there were no guidance counselors at the elementary level, six at the middle school level (serving approximately 2,000 students) and seven at the high school level (also serving approximately 2,000 students). Based upon Padalino's representations, this amounted to a guidance counselor to student ratio of approximately 1:333 at the middle school level and 1:285 at the [*12]high school level. Although somewhat closer to the ASCA's recommended ratio, Padalino and Uebbing agreed that additional guidance counselors were needed, with Uebbing recommending an additional six counselors.
Uebbing reported that one of the most consistent concerns of school officials related to a shortage of qualified social workers. According to Uebbing, at the time of his second report, there were five social workers serving approximately 4,000 students in grades 5 through 12, amounting to a ratio of about 1:800 — more than three times the ratio of 1:250 recommended by the NASW. The school specific findings of Gregory Aidala, defendant's expert for Kingston, differ slightly but also reveal deficiencies. He indicated that, in addition to elementary level social workers, there were six social workers serving around 3,400 students at the middle and high school levels, still resulting in a ratio over the recommended one. Relatedly, Padalino reported that Kingston eliminated a district-wide mental health program serving its elementary schools. That said, a 2013 State Education Department (hereinafter SED) report found that the high school "ha[d] systems in place to support and sustain the safety and socio-emotional health of family, students and staff," offering both one-on-one and group counseling services.
With respect to the educational offerings in Kingston, Uebbing explained that the district's half-day prekindergarten program was largely community based and lacked sufficient transportation, limiting participation. Explaining that "[e]arly interventions are the best way to begin to ameliorate the effects of poverty on school performance," Uebbing concluded that a full-day, wrap-around, prekindergarten program with an emphasis on language acquisition would be a "positive step towards leveling the playing field." Aidala agreed with Uebbing about the importance of expanding universal prekindergarten initiatives, but he regarded such programming as optional.
Although the programming for the general student population was robust, the academic interventions for the district's at-risk students was lacking. Kingston provided some academic and social supports tailored to improve results — including instructional coaches, several reading specialists at the elementary level, a credit recovery program for students at the greatest risk of not graduating, and a Scholars Academy that provided 50 students entering high school with a six-week summer program to prepare them for high school — but Uebbing reported that, in his interviews with district officials, they were consistently "adamant" that the district's AIS offerings suffered owing to monetary constraints. It appears that there was little (if any) AIS programming in subjects other than ELA and math, and no formal Response to Intervention (hereinafter RTI) program in place. Uebbing reported that dedicated AIS providers were not extensively used in Kingston and that, based upon student [*13]performance, Kingston required a substantially increased AIS program at all grade levels, including several additional dedicated AIS specialists at the high school level to provide remediation in all of the core subjects. When considering that just 13% of Kingston's economically disadvantaged students and 4% of its students with disabilities in grades 3 through 8 scored at proficient levels on their state ELA assessments in the 2013-2014 academic year, the inadequacy of the district's AIS offerings and support personnel comes into sharp focus.
Padalino opined that Kingston was "failing" students with disabilities for lack of sufficient programming in place to address their needs. Uebbing agreed, finding that, although the district appeared to be meeting its regulatory requirements, these students were too often placed in programs outside of the regular classroom because the "in-class supports necessary to make inclusion a success were not always available." Nevertheless, the record reveals that Kingston employed a variety of pedagogical approaches for its students with disabilities, including a co-teaching model to create several integrated classes. Although conceding that this was a step in the "right direction," Uebbing nonetheless opined that there were too many students with disabilities per integrated class (up to 12) and that the total integrated class sizes (up to 28) were too large for the inclusion model to work effectively. Aidala also agreed with a 2010 assessment of the high school finding that "[a]pplication of the co-teaching model in integrated classrooms varied greatly" and that "extensive professional development on the co-teaching model" was needed there.[FN18]
The record also reveals significant concerns with respect to Kingston's school facilities. At the time of trial, many of Kingston's schools were between 50 to 100 years old. Although the district had undertaken four major renovation projects between 2006 and 2013, Uebbing found accessibility issues, instances of asbestos, mildew and mold, and HVAC and plumbing systems that were in varying states of disrepair. He also relayed information from district personnel that one of the elementary schools used bottled water exclusively due to poor water quality in the building. Padalino added that, although SED recommends that schools operate at no more than 85% capacity to allow room for present-day methods of instruction, elementary and middle schools in Kingston were operating at 95% capacity. Although Uebbing recognized that Kingston had since received voter approval for a $137 million capital improvement project calling for major renovations to the high school and explained that he would no longer have concerns about the district's facilities if that plan were carried out, Padalino revealed that the project was not yet underway and would not be complete until seven years after the trial. Robert Moje, a licensed architect retained by defendant, observed some of the same [*14]conditions that Uebbing identified during his initial site visits and noted that several of the school buildings in Kingston were rated as unsatisfactory on the most recent building condition surveys conducted in 2010. However, he explained that such a designation should not be interpreted as a building being uninhabitable or preventing the provision of a sound basic education. Aidala and Moje placed great emphasis on the voter-approved referendum and subsequent improvements, and they both ultimately concluded that the facilities did not impede the provision of a sound basic education. We find that conclusion unconvincing.
Inputs Conclusion and Causation
Although Kingston was able to provide a robust academic program for its general student population, the record reveals concerning deficits for the district's at-risk students. There was an approximate 17% reduction in professional staffing levels during the relevant period, the district did not have an adequate number of social workers or guidance counselors, its academic interventions, including AIS, were inadequate and its prekindergarten program serviced only a small fraction of students. Kingston lacked the benefit of $80.2 million in state aid as a result of defendant's failure to phase in Foundation Aid as planned and the implementation of the GEA. Padalino confirmed that additional funding would be used to implement, among other things, a true universal prekindergarten program, a reading recovery program, interventions for students in the upper grades who were at risk of not graduating, and a true integration model for students with disabilities implemented with fidelity. Aidala noted that the "road map was in place," but opined that a reordering of priorities was the vehicle by which to improve results. In light of Padalino's testimony, coupled with the general evidence that the supplemental services at issue can yield better results, plaintiffs have established a constitutional violation with respect to the at-risk students in Kingston during the relevant period.
Mount Vernon City School District
Overview and Demographics
The Mount Vernon City School District is a high need school district in Westchester County, which had between 8,060 and 9,735 students enrolled in its schools during the review period. In the more recent school years, between 66% and 77% of the district's students were economically disadvantaged, 16.1% to 20% had disabilities, and 8% to 9% were LEP students. An average of around 37% of Mount Vernon's annual revenue came from state aid between the 2007-2008 and the 2011-2012 academic years, and, notably, its total per pupil expenditures were higher than the statewide expenditures. Due to a three-year decline in student performance and graduation rates, Mount Vernon was also identified as a focus district.
Inputs
Although the class sizes in Mount Vernon were generally adequate, plaintiffs demonstrated substantial inadequacies in almost every other category[*15]. Timothy Costello, the district's former assistant superintendent for business, explained that, due to reductions in state aid, the district reduced elementary school offerings in special subjects, requiring some schools to choose between providing library, art or music instruction. In addition, clerical staff positions at the elementary schools were cut in half — requiring principals to undertake clerical tasks — and nurse positions were made part time in some schools. At the high school level, teacher caseloads were increased to 125 students with five sections — impacting class size — and, throughout the district, staffing for integrated special education classes was reduced. Costello testified that the district eliminated certain extracurricular activities at the high school, reduced reading teacher positions and could not implement AIS programming at the capacity needed. The record generally confirms Costello's testimony, reflecting a net loss of around 147 professional staff positions between the 2007-2008 academic year (when there was a staffing high) and the 2013-2014 academic year. Student to teacher staffing ratios generally compared favorably with the statewide average by the 2010-2011 academic year, but, given the district's academic results, Kenneth Hamilton, the district's superintendent at the time of trial, opined that Mount Vernon required an increase in teachers, including both classroom teachers and specialists in ELA and math. Uebbing agreed, citing the need for additional teachers, AIS specialists and instructional coaches.
Plaintiffs also proffered evidence of low levels of administrative staff and support personnel, leaving principals little time to visit classrooms and monitor instruction. As reflected in the stipulated data, during the 2013-2014 academic year, Mount Vernon's central administration staff to student ratio was 1:3839 — markedly higher than the county ratio of 1:1075 and the statewide ratio of 1:1579. With respect to support personnel, Mount Vernon had 20 guidance counselors in the 2006-2007 academic year, amounting to a counselor to student ratio of around 1:487 — well above the statewide ratio and the ratio recommended by the ASCA. By the 2013-2014 academic year, the district had just 17 guidance counselor positions. Although the ratio was lower in that academic year due to a drop in student enrollment, it was still almost double the recommendation. Given the intense need of Mount Vernon's students, Uebbing concluded that six additional positions were required. Moreover, Uebbing reported that, for a certain period of time, the 11 elementary schools in Mount Vernon shared three grant-funded guidance counselors, but that grant was set to end at the end of the 2013-2014 academic year.
In 2013, there were 18 social workers serving over 8,000 students, well above the recommended ratio of 1:250. Costello revealed that the district's social workers were assigned to service the needs of the special [*16]education population only, leaving "significant bands of [the] student population" without adequate social work support. The district's ratio of students to psychologists/psychiatrists was also markedly higher than the statewide ratio in the 2006-2007 academic year. Although the district's ratio in this respect fell by the 2013-2014 academic year, comparing favorably to the recommended ratio, Costello explained that Mount Vernon's psychologists were assigned almost exclusively to special education students, creating a shortage for other students.
Turning to the curriculum, Uebbing found that Mount Vernon's academic programming was deficient in many respects. Initially, he was concerned that students were not receiving the full allotment of special classes at the middle school level — including in the areas of art and career skills — and concluded that the district may not have been meeting the minimum regulatory requirements. Nor was it clear to Uebbing that students were receiving the full allotment of mandated physical education programming. Moreover, at one of the middle schools, foreign language electives were limited, with only one teacher offering Spanish to a handful of honors students. Uebbing also relayed that electives were limited at the high school level, and there was an insufficient amount of advanced placement programs or in-house career and technical offerings.[FN19]
Uebbing additionally reported that about 63% of children in the district received a structured half-day prekindergarten experience, concluding that a universal program needed to be implemented. John McGuire, defendant's district-specific expert for Mount Vernon, agreed that prekindergarten programs have "potential value," but he viewed such programming to be optional and noted that the district had declined to apply for grant funding that could have supplemented such programming.
As to targeted academic interventions, Uebbing reported that "there was almost unanimous agreement that the district did not have the resources necessary to truly address the issues of its most needy students." Although Mount Vernon employed 29 certified reading specialists district-wide at the time of Uebbing's first report, these teachers routinely had caseloads of up to 150 students. Concluding that a reading specialist can reasonably be expected to provide adequate interventions for a caseload of 30 students or fewer, Uebbing opined that a significant increase in reading teachers was necessary. The data independently confirms as much, particularly with respect to the elementary and middle school levels, as only 12% of the district's students in grades 3 through 8 scored at proficient levels on the 2013-2014 state ELA assessments.
Mount Vernon's AIS programming was identified by nearly all district officials as most negatively affected by recent budget cuts. Costello confirmed that some students who had needs for AIS were not receiving them due to funding constraints. Uebbing [*17]reported that nearly 82% of the district's elementary school students (approximately 3,200) required AIS based upon their performance on the 2013 state assessments, and that approximately 1,600 students who required additional support in reading did not receive services from a certified reading specialist. Uebbing also noted that the AIS programming was inadequate at the secondary level, concluding that each building should have a certified, designated AIS provider in each of the four core subjects.
Turning lastly to Mount Vernon's students with disabilities, Uebbing concluded that the district appeared to be meeting its regulatory requirements, but did not have a sufficient inclusion model due to inadequate in-class supports. McGuire disagreed, concluding that Mount Vernon employed an adequate number of special education teachers. The data, however, tends to support Uebbing's opinion, as just 1% of students with disabilities scored at proficient levels on their 2013-2014 state ELA assessments and just 3% of such students scored proficiently on math assessments.[FN20]
As to the district's school facilities, although Mount Vernon had spent $23 million to upgrade its facilities — and appears to have been able to provide a safe and orderly environment through its significant security staff — the record reveals concerning failures. Hamilton testified that, upon his first visit to the district, he was "moved to tears to think about the conditions under which children in Mount Vernon [we]re expected to learn." Noting that many of the schools in Mount Vernon are old — with one dating back 120 years — he described some of the conditions as "deplorable," citing heating, water and roofing problems. Hamilton's testimony to that effect was generally corroborated by independent witness testimony and other evidence. Indeed, all of Mount Vernon's school buildings received an overall unsatisfactory rating on a 2010 building survey report and, upon Uebbing's site visits to some of the district's schools, he concurred that "massive capital investments" were necessary. In particular, Uebbing reported that one of the middle schools had a "fair number of spaces" that were "not accessible to students or staff in wheelchairs," the gym floor was warped, sections of the roof leaked, the plaster walls in the nurse's office "had become bowed from moisture," and, at the time of his visit, a restroom was closed because birds were entering through a hole in the building's exterior wall. Uebbing also found Mount Vernon high school to be "in a disturbing state of disrepair," noting that there were gaps in the windows that allowed cold air to pour in during the winter, a flood had occurred in the building a few days before his visit and one of the walls in the auditorium had collapsed in 2010.
Moje noted many issues during his site visits, but again cautioned against placing too much emphasis on unsatisfactory ratings. In his view, many of the areas rated as unsatisfactory [*18]had no impact on education, emphasizing that the issues impacted areas like outside pavement, interior walls, ceilings, flooring, lockers and HVAC systems. Although Moje recognized that at least one of the elementary schools needed to be renovated in the near future, he ultimately averred that the facilities in Mount Vernon did not impede the provision of a sound basic education. We conclude otherwise.
Regarding instrumentalities of learning, Uebbing found that Mount Vernon faced "severe deficits in supplies and equipment it provides to its students." He reported that there were "virtually no" classroom sets of reading materials aligned with the newly-implemented Common Core Learning Standards, many of the textbooks he inspected were "tattered, torn and outdated" and the district's libraries were marred by "empty shelves." He also described a "fragile technology infrastructure," relaying information from the district's director of technology that 75% of the district's computers were over five years old. Costello corroborated that contention, explaining that, until about a year prior to trial, the state of the district's technology was "dreadful" owing to budget constraints, with some of the classroom equipment being too old to support modern software. Although McGuire found that classrooms throughout the district were reasonably well-furnished and equipped for learning, he also observed an inconsistent allocation of technology among the schools, contending that the district needed to "more efficiently deploy [its] available technology resources."
Inputs Conclusion and Causation
Given Mount Vernon's deficient AIS programming, inadequate numbers of social workers, building-level administrative staff and guidance counselors, the concerns about the basic curriculum, the condition of the district's buildings and the state of its instrumentalities of learning, we readily conclude that Mount Vernon's at-risk students were not provided with constitutionally adequate inputs during the stipulated period. We find compelling the fact that, for the 2010-2011 through the 2013-2014 academic years, graduation rates for all students dropped from 62% to 48%. In the 2013-2014 academic year, only 11% of LEP students and 23% of students with disabilities graduated. As to causation, the record reveals that Mount Vernon lacked the benefit of over $116.5 million in funds that it was slated to receive had Foundation Aid been phased in as planned and the GEA not been implemented. Costello indicated that, if funding levels were increased, he would use funds to remedy the deficiencies. Based upon the foregoing, plaintiffs have established a constitutional violation as it relates to the at-risk students in Mount Vernon during the period under review.
Newburgh Enlarged City School District
Overview and Demographics
The Newburgh Enlarged City School District is a high need school district in Orange County, which had between 11,001 and 12,164 students enrolled [*19]in its schools during the subject time frame. In the 2013-2014 academic year, 71% of the district's students were economically disadvantaged, 15% had disabilities and 13% were LEP students. At the time of trial, it was reported that approximately 51% of the district's budget came from state aid. Although Newburgh's total per pupil instructional expenditures were initially lower, they became comparable to those statewide by the 2009-2010 academic year. Similar to many of the other districts, Newburgh was also designated as a focus district.
Inputs
The schools in Newburgh had much to offer in terms of enriched, high-level and specialized programming for its general student population. Despite some issues, the school facilities and instrumentalities of learning were also generally adequate. That said, the record reflects significant deficits in resources for Newburgh's at-risk student population, along with relatively large class sizes, limited early interventions and inadequate extended-day programming. Roberto Padilla, the district's superintendent, explained that morale in Newburgh was low due to the significant programming and personnel cuts that were made to account for state aid shortfalls. The data reflects an approximate 19% decrease in total staff positions — including paraprofessionals — from the 2008-2009 through the 2013-2014 academic years, with the most significant cuts being to reading teachers, social workers, teaching assistants in grade 1 and elementary classroom teacher positions. Student enrollment declined by less than 7% during this same period. The district also eliminated a violence prevention coordinator due to budget constraints, a concerning development given Padilla's testimony that the New Yorker magazine had previously branded Newburgh the "Murder Capital of New York State."
Despite a net loss of about 141 teaching positions between the 2008-2009 and the 2013-2014 academic years, Newburgh's teacher to student ratios — like many of the other districts — generally compared favorably to statewide ratios by the 2010-2011 academic year, as did its administrative staffing ratios. Nevertheless, the district lacked a sufficient number of support personnel, with a high of 22 guidance counselor positions in the 2007-2008 academic year, amounting to a ratio of 1:544. By the 2013-2014 academic year, the district had just 18 counselors for a ratio of about 1:611. Uebbing expressed that the district was "seriously understaffed" in this respect, diminishing its ability to provide sufficient family outreach to students. As for social workers, at the time of trial, Newburgh had just six positions for over 11,000 students, amounting to a ratio of about 1:1833, more than seven times higher than the ratio of 1:250 recommended by the NASW where need is general and 36 times higher than the recommended ratio of 1:50 where need is intense. Of those positions, only one social worker was assigned to the high school, which had over [*20]3,000 students.[FN21] In contrast, Aidala, who also provided expert testimony for Newburgh, concluded that the district had adequate staffing levels, emphasizing that, when compared to other school districts in the county with more than 2,500 students, Newburgh had the second lowest teacher to student ratio in the 2011-2012 academic year and ranked fifth lowest in terms of its ratios of guidance counselors, social workers and psychologists/psychiatrists.
As to the curriculum, Newburg offered half-day prekindergarten programs at several of its schools by the 2013-2014 academic year, including a designated prekindergarten center. Nevertheless, Uebbing estimated that only 40% of children in Newburgh received a structured prekindergarten experience and only half were provided transportation. Edward Forgit, the district's deputy superintendent, testified that, although the district offered some extended learning opportunities — such as a summer credit recovery program for high school students — these services were generally "very limited." Forgit explained that the district had eliminated an early literacy program, cut an after-school tutorial program at the middle schools and limited the number of students who could participate in a preventative summer school program. The district also eliminated an alternative education program directed at disengaged students and cut an alternative to suspension program.
As to Newburgh's AIS offerings, most schools appear to have had dedicated AIS teachers, some of whom were bilingual. There was also a director-level position overseeing an RTI program, along with building-level chairpersons responsible for coordinating strategies for struggling learners. Nevertheless, given that 83% of students in grades 3 through 8 did not score at proficient levels on the 2013-2014 state ELA assessments, Padilla was adamant that the district did not have enough AIS teachers to meet student need. Forgit agreed that additional AIS programming was needed, explaining that there were no math-certified AIS teachers at the elementary or middle school levels and some elementary students did not receive AIS assistance from an AIS teacher at all. As to other services for at-risk students, Newburgh did employ a number of certified reading teachers (around 27 most recently), but Uebbing maintained that this was insufficient for over 11,000 students, the majority of whom were reading below state standards.
Turning to the district's language services, Uebbing reported that, at the time of his second report, there were 1,502 ELL students in Newburgh, including 799 students who received mandated ESL instruction. Although the record reveals that there were a number of bilingual staff in the district, upon speaking with school district officials, Uebbing ultimately concluded that cuts to teaching assistant and aide positions prevented the district from providing the level of support required. Padilla added that the district was out of compliance [*21]with certain state regulations, noting that 24% of its ELL students were also diagnosed with learning disabilities and the district did not have sufficient personnel to support that need. As to the district's students with disabilities, Aidala reported that the district had sufficient resources to support the needs of such students, highlighting that it employed 100 special education teachers and 83 special education teaching assistants in the 2010-2011 academic year. Uebbing found that the district was meeting the minimum regulatory requirements, but again opined that students with disabilities were too often placed in programs outside of the regular classroom setting.
Turning to the average class sizes, Padilla and Forgit testified that kindergarten and grade 1 class sizes needed to be much smaller, with Padilla estimating that Newburgh had as many as 28 students in its kindergarten classes at the time of trial. The average class sizes set forth in the stipulated data differs slightly, revealing an average of 25 students per kindergarten class in the later of the subject years. Although the average common branch class size in the 2013-2014 academic year was 22.5 students, the average grade 6 class size was 26 students. Certain high school courses had average class sizes over 28 students. Uebbing agreed with Padilla that classes needed to be smaller at the elementary level, recommending a class size of 16 in kindergarten, which could then be gradually increased to 20 students by grade 4. He also recommended additional teachers at the middle and high school levels in order to "avert a very serious situation" in terms of the average size of core content classes.
C. Inputs Conclusion and Causation
Upon our review of the record, we conclude that plaintiffs have established that the inputs in Newburgh were inadequate for at-risk students during the period under review. Newburgh's early interventions and extended learning opportunities were scaled back, and officials expressed concern about the AIS offerings. In addition, the district lacked an adequate number of social workers and its class sizes were too large, particularly at the lower grade levels. With respect to causation, the record reveals that Newburgh did not receive a total of over $238.9 million in state aid as a result of the failure to phase in Foundation Aid as planned and the implementation of the GEA. Sounding a common theme, Padilla and Forgit explained that they would use additional funding to remedy the described deficiencies. Uebbing agreed that the reductions in state aid "result[ed] in cuts to essential staff and programs and services needed to provide a meaningful high school education, particularly for the district's large proportion of low income (at-risk) students." This evidence informs our conclusion that plaintiffs have established a constitutional violation as it relates to the at-risk students in Newburgh during the period under review.
Niagara Falls City [*22]School District
Overview and Demographics
The Niagara Falls City School District is a high need school district in Niagara County, which had between 6,535 and 7,518 enrolled students during the review period. In the 2013-2014 academic year, 69% of the district's students were economically disadvantaged, 16% had disabilities and 1% were LEP students. District officials reported that, at the time of trial, the City of Niagara Falls had one of the highest teen pregnancy rates in the state, with the district having between 50 and 75 students who were parents at any given time. Reflecting its status as a high need district, Niagara Falls' total per pupil instructional expenditures between the 2006-2007 and the 2011-2012 academic years were lower than the statewide average, sometimes dramatically so.
Inputs
The record supports Supreme Court's findings regarding the sufficiency of the resources for the general student population in Niagara Falls. The curriculum for this student population was robust, the district's technology stellar and the district's facilities and class sizes adequate. Although there were some issues regarding the traditional instrumentalities of learning, no district-wide failures were established. That said, the offerings for at-risk students were less than minimally adequate. Between the 2008-2009 and the 2013-2014 academic years, there was an approximate 12% decrease in the district's total professional staff positions, while student enrollment declined by only about 5%. Teacher positions also declined by a little less than 10% during that time frame and the district's ratio of classroom teachers to students exceeded the statewide average in each of the subject school years. Fraser concluded that more teachers were necessary to enable the district to provide adequate AIS and that certified attendance teachers should be employed to address the district's pervasive attendance issues. Thomas Coseo, defendant's expert for Niagara Falls, agreed that the district was the highest need school district in the county and required 110 additional classroom teachers to obtain comparable student to teacher ratios. However, rather than rely on increased funding to reach those ratios, he advocated for a redeployment of existing resources.
With respect to support personnel, Niagara Falls had 25 guidance counselors in the 2008-2009 academic year, for a ratio of about 1:281 — close to the recommended ratio and only slightly above the statewide ratio. By the 2013-2014 academic year, the district had 24 counselors, amounting to a ratio of around 1:279 in comparison to the statewide ratio of 1:641. The high school also had a career counseling program and career days, and Coseo reported "[e]vidence of a well-developed articulated career education program" at both the elementary and secondary schools. Nevertheless, district officials testified that additional guidance counselors were needed, noting that many students in the district [*23]were the first in their families to go to college. Fraser agreed, emphasizing that guidance counselors in the district were struggling to meet the intense needs of its students, a concern that comes into sharp focus when considering that the district did not employ any social workers at the time of trial.
As to the curriculum, Mark Laurrie, the district's deputy superintendent, testified that Niagara Falls lacked adequate staff to fully implement AIS. Despite Fraser's estimate that only 3.1% of grade 8 students were proficient in math on the most recent state assessments, Laurrie reported that AIS in math was entirely cut at the secondary level due to inadequate staffing. Fraser also concluded that the AIS offerings were insufficient, reporting that no AIS was provided in social studies or science at the middle schools and no AIS support was provided in math or ELA in grades 10 through 12 due to staff shortages. For the same reason, students with disabilities were not being scheduled for small group support in math at the elementary or secondary levels.
As to extended learning opportunities and other support, Fraser reported that budget cuts had resulted in the discontinuation of certain after school support programs at all levels, with the high school recently discontinuing a summer bridge program for students entering grade 9. He also emphasized the need for more certified attendance officers given the district's levels of late arrivals and truancy. At the time of trial, the district was down to just one attendance teacher for over 6,500 students. As for language services, Laurrie explained that, at the time of trial, the district employed only three ESL teachers and one ESL associate for approximately 90 students, amounting to a ratio of one ESL teacher for about 30 students. Moreover, Fraser noted that, because many of the ELL students in Niagara Falls also required IEP services, it was difficult for the district to meet their needs.
Turning lastly to the district's students with disabilities, the data reflects that Niagara Falls spent around $12,000 less per special education pupil in the 2011-2012 academic year than schools statewide even though it had comparable percentages of such students. Laurrie reported that the high school had a ratio of around 20 special education students to one teacher, which did not meet student need. Moreover, district officials revealed that the district was unable to employ a co-teaching model for its special education students due to staffing shortages, and several self-contained classrooms exceeded appropriate enrollments in the 2012-2013 academic year, requiring the district to obtain state waivers. Fraser observed that, at four elementary schools, certain services for students with disabilities — such as physical, occupational and speech therapies — were provided in hallways, under stairwells or in foyers.
Inputs Conclusion and Causation
Like all of the subject school districts, the inputs [*24]for Niagara Falls' at-risk student population were inadequate. The district did not employ a single social worker at the time of trial, AIS offerings were severely curtailed, extended learning opportunities were scaled back and services for students with disabilities were limited. As to causation, the record reflects that Niagara Falls did not receive over $128.9 million as a result of Foundation Aid not being phased in as planned and the implementation of the GEA. Although Coseo hypothesized that Niagara Falls could redirect existing resources from "less effective budget lines" if it felt that more intensive remedial programs were needed, he acknowledged that the amount of money at issue here, if spent effectively, could "absolutely . . . make [a] significant difference." Fraser opined that the reductions "had a devastating effect" on the district, requiring "cuts to necessary programs, staff and services." Based upon this evidence, we find a causal nexus has been demonstrated and a constitutional violation shown with respect to the at-risk students in Niagara Falls during the period under review.
Port Jervis City School District
Overview and Demographics
The Port Jervis City School District is a small city school district in Orange County, which had between 2,769 and 3,224 enrolled students during each of the stipulated academic years. In the 2013-2014 academic year, 62% of the district's students were economically disadvantaged, 17% had disabilities and 1% were LEP students. An average of around 51% of the district's annual revenue came from state aid between the 2006-2007 and the 2012-2013 academic years, and its total per pupil educational expenditures were, with some exceptions, generally consistent with the statewide averages during the period reported.
Inputs
The record supports Supreme Court's findings with respect to the adequacy of the curriculum for the general student population. Although the record reflects certain issues with respect to the facilities — particularly at the middle school level — we are also satisfied that they were minimally adequate. Moreover, the class sizes were generally sufficient and the instrumentalities of learning satisfactory. Nevertheless, plaintiffs have demonstrated that the resources for at-risk students were constitutionally inadequate. Thomas Bongiovi, the district's superintendent, revealed that the district lacked resources to provide necessary social supports to its students. Although Port Jervis appears to have staved off personnel cuts for longer than some of the other districts, its professional staff positions still decreased by about 8% between the 2010-2011 and the 2013-2014 academic years, in contrast to a 6% decrease in student enrollment.
Port Jervis had teacher to student ratios and guidance counselor to student ratios that compared favorably to the statewide averages in the later of the school years. Jeffery McLellan, defendant's expert for Port Jervis, reported that [*25]the high school had begun an initiative to work with students to increase transcript and credit awareness well before graduation, and there appears to have also been "guidance evenings" available to parents, among other supports. Despite such initiatives, Uebbing concluded that additional guidance counselors were needed. Moreover, the district had an insufficient number of social workers, with Bongiovi testifying that it employed just four. Using 2013-2014 enrollment numbers, that would amount to a ratio of over 1:600 district-wide — far above the recommended ratio. Bongiovi opined that this was "not nearly enough" to support the district's students, many of whom lacked "the basic needs of life." Bongiovi noted that many of the district's students with disabilities had mandated counseling multiple times per week, taking up most of the time of both the school psychologists and the social workers.
McLellan referred to Port Jervis as "a safety net for at-risk children," with "programs in place [that had] increased the probability that students [would] succeed in the face of other detrimental factors outside of the school day." However, Bongiovi reported that Port Jervis had only 36 available slots for a half-day prekindergarten program provided through grant funding. Although the prekindergarten program offered an array of services, the limited capacity was far from sufficient for the number of children in Port Jervis who could have benefited from earlier intervention. Moreover, Uebbing reported that the district did not have programs in place to support students who were at risk of dropping out, a concerning development given the district's 15% dropout rate in the 2013-2014 academic year.
As to targeted academic interventions, Uebbing revealed that the district employed 11 reading specialists assigned to kindergarten through grade 6, but he averred that more were needed. Bongiovi agreed, highlighting the "atrocious" ELA scores at the elementary level.[FN22] In fact, the data reveals that students were failing at many levels in Port Jervis, as only 18% of students in grades 3 through 8 scored at proficient levels on the 2013-2014 state ELA assessments. When disaggregated by student group, those numbers dropped to a 12% proficiency rate for economically disadvantaged students and a 1% proficiency rate for students with disabilities. McLellan himself noted that "[t]he ELA and mathematics testing results indicate that there is much work to be done."
Port Jervis appears to have had a better AIS plan in place than some of the other districts, but Uebbing concluded that it was not sufficiently staffed to meet student need. Although it is unclear whether AIS was provided in all of the core subjects, the record reflects that there were AIS offerings in both ELA and math at the elementary level, with McLellan reporting that he observed AIS instructional groupings as small as four students. That said, McLellan did agree at trial that Port Jervis [*26]could benefit from additional AIS funding, particularly with respect to its students with disabilities.
As for such students, Uebbing concluded that the district appeared to be meeting the minimum regulatory requirements, but its service options were limited, with the record revealing that this had necessitated more costly out-of-district placements for certain of Port Jervis' students with disabilities. McLellan also agreed with district officials that the special education student need had increased in recent years and that certain of its services required attention to improve graduation rates. Although noting that the district had since implemented an inclusive model in which more students were able to be educated in-house, McClellan acknowledged that "shifting from out-of-district placements to newly developed in-house special education programs is a worthy investment which programmatically will benefit students." Again, he suggested a reallocation of funds to support that goal.
Inputs Conclusion and Causation
Port Jervis, like Kingston, was a district in good standing during the review period, and it was not as dependent on state aid as some of the other districts. That said, the record displays inadequate services for its at-risk students, with insufficient numbers of social workers, guidance counselors and reading specialists. Moreover, the prekindergarten programming was limited and Uebbing reported deficiencies in programming for students at risk of dropping out. The deficiencies in this respect are concerning when weighed against the very poor student performance. Turning to causation, the parties agree that Port Jervis did not receive $67.3 million that it was slated to receive under Foundation Aid when factoring in the implementation of the GEA. Plaintiffs elicited testimony that additional funds would be used to, among other things, hire additional staff, provide better training to teachers and implement programs for at-risk students. Given the foregoing, we conclude that a constitutional violation has been shown with respect to the at-risk students in Port Jervis during the period under review.
Poughkeepsie City School District
Overview and Demographics
The Poughkeepsie City School District is a high need school district in Dutchess County, which had between 4,240 and 4,660 students during the review period. From the 2010-2011 through the 2013-2014 academic years, 74% to 91% of the district's students were economically disadvantaged, 15% to about 17% had disabilities and 10% to 11% were LEP students. Poughkeepsie was a "walking district" during the relevant time frame, meaning that there was no district-provided transportation to or from school. An average of approximately 66% of Poughkeepsie's annual revenue came from state aid during the period reported, its total per pupil instructional expenditures were lower than the statewide average, and it was identified as a focus district.
Inputs
We find that Poughkeepsie's [*27]educational technology and curriculum for the general student population were minimally adequate. Although some of the class sizes were problematic at the lower grade levels, plaintiffs did not establish that the class sizes were chronically overcrowded on a district-wide basis. However, the record reveals serious deficits in inputs for at-risk students.
Ralph Coates, the president of Poughkeepsie's Board of Education, estimated that, due to shortfalls in state aid, the district eliminated around 130 positions in the five years prior to trial, including teachers, teaching assistants, administrators and security personnel. When factoring in paraprofessional positions, the stipulated data reveals a net loss of about 113 positions from the 2008-2009 to the 2013-2014 academic years — an approximate 20% decrease. Comparatively, student enrollment decreased by just under 7% during the same years.
As to support personnel, Poughkeepsie employed just six guidance counselors in the 2006-2007 academic year and seven guidance counselors in the remaining years. When considering student enrollment in the 2013-2014 academic year, this amounted to a total ratio of approximately 1:606, which was lower than the statewide ratio but significantly higher than the ratio recommended by the ASCA. Coates testified that Poughkeepsie employed only five social workers at the time of trial. Using 2013-2014 enrollment data, this would amount to a ratio of 1:848 — more than three times the recommended level. Since there were more schools than social workers, some buildings had to share social workers and some only had half-day support. Nevertheless, Roger Gorham, defendant's expert for Poughkeepsie, viewed staffing levels to be adequate.
Turning to the curriculum, with some assistance from a state grant, Poughkeepsie opened an Early Learning Center in a formerly decommissioned elementary school that had been closed for fiscal reasons, which offered prekindergarten and kindergarten programming. Although the center provided several services, both were half-day programs, resulting in many students being unable to attend. Nicole Williams, the superintendent, revealed that Poughkeepsie was the only district in the Hudson Valley that did not have a full-day kindergarten program. In Wozniak's opinion, the half-day program ran the risk of "negat[ing] the gains made in pre-[kindergarten]" and could "cause students to enter first grade behind." Vanessa Weeks, the district's executive director of family and student support services, echoed that sentiment, explaining that around 25% of Poughkeepsie's kindergarten students came from economically disadvantaged backgrounds and full-day kindergarten was "critical" for them. In Weeks' estimation, a half-day program was even less adequate for students with disabilities, whose time in the program would be further limited given their need for other services. Although the district appears to have offered an adequate academic program [*28]at the upper grade levels, some concerns were expressed regarding the programming at the middle and high school levels.
Turning to the offerings for at-risk students, Williams estimated that only 10% of students in grades 3 through 8 were reading at grade level — a number that is also generally corroborated in the state assessment data. Although the district did employ reading teachers, with Gorham reporting 10.6 such positions in the 2012-2013 academic year, student enrollment during that time frame was over 4,000. In Wozniak's opinion, more literacy support was needed at the high school and middle school levels. As for AIS programming, Poughkeepesie implemented an RTI model in 2011. However, Williams testified that the district's services failed to provide adequate intervention for the 90% of students in kindergarten through grade 12 that she estimated were entitled to remediation. Williams indicated that the district did not have the resources to provide consistent AIS to kindergarten students and, with respect to the elementary level, Wozniak concluded that AIS instructional groupings — then averaging around 11 students — were too large. Wozniak also noted that there was an insufficient number of staff to offer AIS in math to all middle school students who qualified. At the high school level, the AIS offered throughout the subject period varied greatly, but Coates made clear that the school had been out of compliance with state regulations.
The extended-day opportunities in Poughkeepsie were also somewhat limited, particularly at the middle school level, where Wozniak reported that a homework help center was no longer open for drop in help.[FN23] Although the high school had received a grant that provided resources for summer school to incoming high schoolers, and previously provided extended-day and credit-recovery services, Coates explained that the district did not have the funding to maintain many of those services. Turning to the district's language services, Williams revealed that an external review, conducted a week before her testimony, concluded that additional ESL teachers were needed in order to meet the minimum number of ESL minutes mandated by the state. Moreover, Wozniak reported that a 2008 audit found a need for expansion of Poughkeepsie's ESL programming, and a 2012 evaluation cited a consensus among middle school faculty members regarding a limited availability of instructional materials to support students with language-based needs.
As to students with disabilities, although Gorham found adequate staffing levels, Weeks estimated that only 54% of students with disabilities graduated at a given time.[FN24] Based on information provided by Poughkeepsie's former superintendent, in the 2012-2013 academic year, the district employed 60 special education teachers. Using enrollment data from that period, the special education teacher to special education student ratio district-wide would have been approximately 1:10. Nevertheless[*29], Weeks revealed that the district's special education program was full at the time of trial and any new students requiring such services would be placed out of district.
With respect to school facilities, Poughkeepsie's school buildings were built between 1912 and 1969. Although the district had undertaken approximately $22.8 million worth of renovations in 2009, the buildings still presented many concerns at the time of trial. To that end, Williams relayed instances of T-1 lines that would go out when it rained (limiting communication with families), broken ceiling tiles that were no longer manufactured and were therefore held in place with paper clips, chronically leaking roofs, air quality issues and problems with mold and mildew. Wozniak also cited a "critical need[] . . . [for] replacement of the steam heating systems in many of the buildings," noting that a boiler failure had caused one of the schools to close. Coates noted many of the same problems, explaining that the last building review revealed approximately $70 million worth of district-wide repairs, with many still remaining at the time of trial. Although Moje noted that many of the schools that he visited were rated as unsatisfactory on the most recent building condition surveys, he opined that the negative ratings mostly encompassed age-related issues that had no impact on education and noted that additional funds had been approved for further repairs. We find Moje's opinion regarding the survey ratings untenable, as the conditions rated as unsatisfactory pertained to water distribution systems, heat generating systems and HVAC controls — systems of critical importance to provide a satisfactory educational environment.
As for a safe and orderly environment, all schools in Poughkeepsie had security personnel at main entrances, along with visitor sign-in procedures. Nevertheless, a 2013 SED-led review of the middle school found that it was "not creat[ing] a safe environment conducive to learning." Moreover, a 2011-2012 progress review of the high school noted a lack of on-site police presence due to fiscal constraints, with the district reporting that this had led to an increase in violence. Considering this cut, along with the reintegration of formerly-incarcerated and socially-challenged students into the building accompanying the elimination of the district's alternative learning program, Wozniak concluded that security at the high school needed supplementing.
With respect to Poughkeepsie's instrumentalities of learning, Coates testified that library books across the district were old, dating back to the 1970s and 1980s. Wozniak agreed, concluding that the library and textbook offerings at the middle school level were outdated and that the high school was "greatly lacking" in supplies and materials generally. Although Gorham recounted information from principals that classroom supplies and library collections were augmented throughout the district by teachers and [*30]parents, he noted that this was a common practice in all school districts, "especially in periods of economic downturn." Upon his own observations, Gorham ultimately concluded that students in Poughkeepsie "were, in fact, provided with the basic instrumentalities required for a sound basic education." Gorham's view is unconvincing, and it is no solution to rely on the generous, voluntary contributions of teachers and parents to fill the gaps left by deficient state funding.
Inputs Conclusion and Causation
During the relevant time frame, Poughkeepsie only provided a half-day kindergarten program, had an insufficient number of social workers, guidance counselors and other support staff to meet student need, had an inadequate platform of services for at-risk students and there were serious issues with respect to its facilities. On this record, plaintiffs have established that the inputs were constitutionally inadequate. As to causation, Poughkeepsie lacked the benefit of around $79.9 million in funding that it was slated to receive before defendant's decisions not to phase in Foundation Aid as originally planned and to implement the GEA. There was ample testimony that the deficiencies stemmed from a lack of resources and that additional funds would be used to restore the district's essential programming and services and to hire teachers. This evidence compels the conclusion that plaintiffs have established a constitutional violation with respect to at-risk students in Poughkeepsie during the period under review.
Utica City School District
Overview and Demographics
The Utica City School District is a high need school district in Oneida County, which had between 8,856 and 9,709 students enrolled in its schools during the review period.[FN25] By the 2013-2014 academic year, 83% of Utica's students were economically disadvantaged, 16% had disabilities and 16% were LEP students. At the time of trial, the City of Utica was home to a federal refugee center and the district had a significant number of refugee students, as well as about 105 homeless students. Approximately 74% of the district's annual revenue came from state aid in the 2012-2013 academic year, and its total per pupil instructional expenditures were lower than the statewide averages during the reporting period, often drastically so. Utica was also identified as a focus district.
Inputs
Although plaintiffs presented some evidence of troubling school-specific facilities issues, in our view, they did not show district-wide inadequacies. That said, plaintiffs established deficiencies in nearly every other category of inputs. Citing "extreme financial dire," district officials reported that many positions were cut to correct budget deficits caused by state aid shortfalls, including teachers, guidance counselors, social workers, attendance officers, parent liaisons and literary coaches. As reflected in the stipulated data, approximately 170 total professional staff positions — including [*31]paraprofessional staff — were cut between the 2010-2011 and the 2013-2014 academic years, resulting in a decrease of around 16%. Again, student enrollment in Utica was increasing.
As to specific staffing ratios, Utica's student to teacher ratios were often higher than the statewide average even after the universal statewide increases in the 2010-2011 academic year. Bruce Karam, Utica's superintendent, testified that it was essential that the district restore the teaching positions that were eliminated in order to increase test scores and graduation rates — a sentiment with which Wozniak agreed. Administrative staffing ratios were also problematic, with Karam testifying that the district was operating with a "skeletal crew." Indeed, the data reflects that Utica's administrative staff to student ratios were higher than the statewide average during all of the subject academic years, and its central administration staffing ratio was more than three times higher than the statewide average in the 2013-2014 academic year. Wozniak found that, in light of staffing cuts, central office administrators were "overload[ed]" with expanded responsibilities.
As to the district's support personnel, Utica had a high of 21 guidance counselors in the 2010-2011 academic year, but by the 2013-2014 academic year, the district had just 13 positions, for a ratio of around 1:742 — nearly three times the recommended ratio. Karam testified that he believed these positions needed to be reinstated. With respect to school psychologists, five such positions had been cut between the 2010-2011 and the 2013-2014 academic years due to budget constraints, leaving a psychologist/psychiatrist to student ratio of 1:1377 in comparison to about 1:953 statewide. As to the district's social work support, Gorham, who also provided expert testimony regarding Utica, reported that the district had 21 positions in the 2011-2012 academic year. Using the stipulated student enrollments for that academic year, that would amount to a ratio of 1:458. It appears that at least 11 social workers were eliminated from the district's budget before the start of the 2013-2014 academic year, increasing the ratio further. Wozniak also cited a "critical need" for social workers, reporting that there was only part-time support at one of the elementary schools. Gorham disagreed, considering the staffing cuts to be in line with the five-year trend of "belt tightening" experienced statewide.
Cuts to the curriculum were also made due to budget shortfalls, including to art and elementary level physical education programming. Indeed, Lorene Eccleston — Utica's director of early instruction — revealed that the district was satisfying its physical education requirements in part by having students do jumping jacks in the classrooms. Utica also cut English and math electives at the middle school level so that teachers had time to provide AIS. As of Wozniak's site visit in January 2013, intramural sports [*32]had been eliminated at one of the middle schools, and fine arts and physical education programming had been reduced by 50%. Programming cuts were also made at the high school level, with Eccleston noting that there were only four art teachers to service approximately 2,800 students. Although a 2013 SED report indicated that a variety of activities were available to high school students outside of the classroom, Wozniak reported that several supplemental programs had been cut or reduced due to budget constraints, including an alternative education program and remedial programs.
Turning to Utica's services for at-risk students, the district did employ reading specialists and AIS teachers during the subject period. However, Eccleston noted that several reading teachers had since been let go and that Utica was not in compliance with state regulations in terms of its AIS offerings. Eccleston explained that the district was not able to provide AIS in science or social studies at the high school level. Moreover, despite the fact that only 11% of economically disadvantaged students scored at proficient levels on the 2012-2013 state ELA assessments, and only 12% scored proficiently on the 2013-2014 state assessments in this category, the district was forced to supplement its AIS offerings with teaching assistants who "work[ed] under the auspices of the classroom teacher." Although some AIS was provided at the middle and high school levels in ELA and math, SED-led reviews as far back as December 2010 demonstrate that AIS was not offered to all students who required it. Wozniak also found that the AIS instructional groupings at one of the middle schools were too large, reporting that there were 25 to 29 students in math intervention classes.
In terms of family outreach, Utica did employ parent liaisons at the middle and high school levels, but all such positions had been eliminated at the elementary level by the time of trial. As far as other learning opportunities, Eccleston reported that the district eliminated a transition program for special education students due to fiscal constraints, along with all summer programming at the middle school level. A Young Scholars program for selected at-risk students in grades 7 through 12 had also been curtailed. District officials also noted the elimination or curtailment of an alternative evening program, a credit recovery program and a diversion program. Wozniak also found that supplemental after-school programming was needed.
With respect to Utica's language services, many SED- and district-led reviews reflected that instructional practices failed to address the needs of the district's LEP students. As to services for students with disabilities, 16 special education teachers were cut between the 2012-2013 and the 2013-2014 academic years. Meanwhile, 0% to 1% of students with disabilities in grades 3 to 8 scored at proficient levels on state ELA assessments during that time. Wozniak reported that [*33]some students with disabilities at the middle school level were not receiving mandated social and psychological assessments, and a number of SED reviews generally support Wozniak's contention, also referencing failings regarding this student population.
The class sizes in Utica were also too large. In the 2013-2014 academic year, the average kindergarten class size was 28.5 students and the average common branch class size was 26.3 students. The class sizes had increased further by the time of trial, with Eccleston testifying that the average kindergarten class size was around 30 students and the average class sizes in grades 1 and 2 ranged from 29 to 31 students. Noting that many kindergarten students in Utica enter school at a developmental age of 2½, Eccleston was adamant that these class sizes were "educationally unsound." Wozniak also observed large class sizes during her site visits, citing research showing a correlation between reduced class size and improvement in student achievement, particularly in kindergarten through grade 3. Notably, in CFE II, the Court of Appeals referenced the fact that a significant number of New York City public school students in kindergarten through grade 3 were taught in class sizes of 26 or more, concluding that the plaintiffs therein had "presented measurable proof . . . that New York City schools have excessive class sizes" (Campaign for Fiscal Equity v State of New York, 100 NY2d at 911).
As to Utica's instrumentalities of learning, Wozniak reported, among other complaints, that the high school's library collection was "small and outdated." Gorham agreed that the library's holdings were lacking, and a 2010 SED-led review also found as much. Gorham also noted complaints from district officials "with regard to books, supplies and equipment," but he did not observe any classroom teachers being "unable to carry out their mission due to perceived inadequacies in these areas." As far as technology, the elementary and middle schools appear to have had sufficient computer resources and SMART Board technology. However, Wozniak reported that technology at the high school level was diminished, and Gorham also observed that one of the two computer labs available to high school students had been dismantled at the time of his visit.
Inputs Conclusion and Causation
During the school years at issue, Utica had some of the highest need and faced some of the greatest educational challenges. Despite this reality, it lacked adequate resources for its at-risk students, including sufficient numbers of administrators, social workers and guidance counselors, adequate AIS instruction and extended-day programming. Compounding these issues, students were instructed in large class sizes, particularly at the lower grade levels. When considering the totality of the evidence, we readily conclude that the inputs in Utica were constitutionally inadequate for its at-risk student population during the period under review. [*34]The record reveals that Utica lacked the benefit of over $290 million in state aid that it was slated to receive before Foundation Aid was not phased in as planned and the GEA was implemented. District officials consistently testified that, if additional funding were available, Utica would remedy the deficiencies in the inputs, particularly with respect to its at-risk student population. In light of the foregoing, plaintiffs have established a sufficient nexus and a constitutional violation with respect to the at-risk students in Utica during the period under review.
Concluding Remarks
As articulated by Judge Kaye in her concluding statements in CFE II, our role in this case is to review the services provided in each of the subject school districts "not in order to make policy but in order to assure the protection of constitutional rights" (Campaign for Fiscal Equity v State of New York, 100 NY2d at 931). The plaintiffs in CFE II "prevailed . . . owing to a unique combination of circumstances" (id.) and, in our view, plaintiffs in this case have demonstrated a similar set of coalescing circumstances with respect to the at-risk student population in the subject school districts sufficient to establish a constitutional violation. Each of the subject school districts had a high percentage of at-risk students during the stipulated academic years — those who came from impoverished backgrounds, had disabilities, or whose primary language was one other than English. The compelling evidence demonstrated that, in order to place a sound basic education within the reach of such students, they require early interventions, more time on task and other supplemental programming, as well as support from adequate numbers of guidance counselors, social workers or other similar professionals. Despite these enhanced needs, the districts lacked a combined total of over $1.1 billion in funding slated to be issued under Foundation Aid, necessitating further cuts to already diminished staff and essential services. Most unfortunately, the performance of the students in these districts suffered as a result. Working from the premise articulated in CFE II that all children can succeed when given appropriate instructional, social and health services, we find — based upon the evidence of inadequate inputs, poor outputs and a causal connection to defendant's school financing system — that plaintiffs have established a constitutional violation with respect to the at-risk student population in each of the subject school districts.
REMEDY
As plaintiffs have established their claim, the remaining question concerns the appropriate remedy. Plaintiffs seek declarations that a constitutional violation has been established, along with an injunction "[p]ermanently enjoining [d]efendant to create and maintain a [s]tate education aid system and funding levels that comply with the requirements of the [Education Article] and that provide a meaningful opportunity to receive" a sound [*35]basic education. As noted by the Court of Appeals in CFE II, "it is the province of the Judicial branch to define, and safeguard, rights provided by the [NY] Constitution, and order redress for a violation of them" (Campaign for Fiscal Equity v State of New York, 100 NY2d at 925). However, mindful of our responsibility "to defer to the Legislature in matters of policymaking, particularly in a matter so vital as education financing" (id.), we emphasize that we have no authority to direct the nature of the remedy or the manner in which it is implemented. It is up to "[defendant] to craft an appropriate response, subject to judicial review" (Aristy-Farer v State of New York, 29 NY3d at 515). The process to define and implement the appropriate remedy will take time, but should be pursued in due course (see Campaign for Fiscal Equity v State of New York, 100 NY2d at 930). We therefore render a declaration in plaintiffs' favor and remit the matter for further proceedings.
Garry, P.J., Egan Jr., Clark and Pritzker, JJ., concur.
ORDERED that the order and judgment is modified, on the law, without costs, by declaring that plaintiffs have demonstrated a violation of NY Constitution, article XI, § 1 in each of the subject school districts as it relates to the at-risk student population; matter remitted to the Supreme Court for further proceedings not inconsistent with this Court's decision; and, as so modified, affirmed.



Footnotes

Footnote 1: In particular, "[c]hildren are entitled to minimally adequate physical facilities and classrooms which provide enough light, space, heat, and air to permit children to learn. [They] should [also] have access to minimally adequate instrumentalities of learning such as desks, chairs, pencils, and reasonably current textbooks. Children are also entitled to minimally adequate teaching of reasonably up-to-date basic curricula such as reading, writing, mathematics, science, and social studies, by sufficient personnel adequately trained to teach those subject areas" (Campaign for Fiscal Equity v State of New York, 86 NY2d at 317).

Footnote 2: Although this action was originally commenced on behalf of students in several additional school districts, claims related to eight districts remained pending at the time of trial. The eight districts at issue are: Jamestown City School District, Kingston City School District, Mount Vernon City School District, Newburgh Enlarged City School District, Niagara Falls City School District, Port Jervis City School District, Poughkeepsie City School District and Utica City School District.

Footnote 3: Foundation Aid was originally intended to increase school aid funding by approximately $5.5 billion annually when fully implemented over a four-year period (154 AD3d at 1251). Although it was distributed as originally planned in the 2007-2008 and 2008-2009 school budgets, it was frozen at then-existing levels in the 2009-2010 budget year and the phase-in period was extended to seven years. Moreover, the 2010-2011 budget introduced a Gap Elimination Adjustment, which reduced formula-based school aid by a net $1.4 billion in that budget year. The Gap Elimination Adjustment was continued through the 2015-2016 budget (id.).

Footnote 4: The original complaint was filed prior to defendant's decision not to phase in Foundation Aid as planned.

Footnote 5: Prior to trial, we affirmed an order of Supreme Court (Devine, J.) that denied defendant's motion to dismiss the second amended complaint, rejecting defendant's argument that plaintiffs' claims were moot given the additional funding anticipated to be provided by Foundation Aid (Hussein v State of New York, 81 AD3d at 137).

Footnote 6: The parties stipulated that the trial would pertain to the 2006-2007 through the 2013-2014 academic years.

Footnote 7: The inadequacy of the outputs was and continues to be undisputed.

Footnote 8: At the time of trial, these experts had a combined total of over 50 years of experience in school administration.

Footnote 9: Supreme Court also referenced other grounds for rejecting the opinions of these experts, which we do not find compelling.

Footnote 10: To the extent that plaintiffs and the amici advance the argument that poor results may give rise to a presumption of insufficient inputs without any additional evidence, we reject it outright (see Campaign for Fiscal Equity v State of New York, 100 NY2d at 903; Campaign for Fiscal Equity v State of New York, 86 NY2d at 316-317).

Footnote 11: AIS is designed to help students who are not meeting State Education Department proficiency standards in English language arts, mathematics, social studies and science, depending on grade level (see generally 8 NYCRR 100.2 [ee] [1]-[3]). Taking judicial notice of information obtained from the State Education Department's website (see Matter of Executive Cleaning Servs. Corp. v New York State Dept. of Labor, 193 AD3d 13, 18 n 4 [2021]), AIS includes two components: "additional instruction that supplements the general curriculum" and "student support services needed to address barriers to improved academic performance" (State Education Department, Academic Intervention Services: Questions and Answers at 4 [Jan. 7, 2000]). Additionally, students with limited English proficiency (see generally Education Law § 3204; 8 NYCRR part 154) and students with disabilities (see generally 20 USC § 1400 et seq.; 29 USC § 794; Education Law art 89; 8 NYCRR part 200) may also be eligible for AIS in addition to other services they receive (see generally 8 NYCRR 100.2 [ee] [2] [d]; [s] [1]). Response to Intervention is a distinct, but conceptually similar program used to identify students in need of supplemental intervention (see 8 NYCRR 100.2 [ii] [1] [i]; see generally State Education Department, Response to Intervention, Guidance for New York State School Districts at 1 [Oct. 2010]). A school district may provide a Response to Intervention program in addition to or in lieu of providing AIS under certain circumstances (see 8 NYCRR 100.2 [ee] [7]).

Footnote 12: The stipulated data only contains per pupil instructional expenditure information for these academic years.

Footnote 13: We note that the Court of Appeals rejected nationwide comparisons in CFE II when discussing the outputs and causation elements of an Education Article claim (see Campaign for Fiscal Equity v State of New York, 100 NY2d at 916, 921). In our view, comparing inputs on a statewide basis is similarly problematic, as it does not account for the particular needs of the at-risk student population in question and presumes, without evidence, that students in other districts across the state are being offered the opportunity for a sound basic education.

Footnote 14: Based upon information obtained from a prior superintendent, Wozniak reported that there were two part-time social workers that serviced the district. The discrepancy in the data does not impact our analysis, as it is clear that Jamestown lacked an adequate number of social workers or similar personnel during the relevant time frame.

Footnote 15: Although the stipulated data reflects 18 guidance counselors that year, Joy indicated that this was a reporting error and that the district had only around 15 full-time equivalent positions.

Footnote 16: Wozniak reported that, at some point, AIS appeared to have been offered in both reading and math at certain levels. Again, this discrepancy does not affect our analysis.

Footnote 17: The stipulated numbers with respect to the total state aid shortfalls for each district are from the 2010-2011 academic year through the 2014-2015 academic year.

Footnote 18: The record does not contain sufficient data to make any definitive district-wide conclusions about Kingston's services for its LEP students.

Footnote 19: Nonetheless, by the time of trial, Mount Vernon had implemented new initiatives to increase program offerings, including a work-study program, a career and technical education initiative, classes in physical education, art and health, and a secondary literacy acceleration program.

Footnote 20: The record does not contain sufficient data to make any definitive conclusions with respect to the adequacy of Mount Vernon's offerings to its LEP students.

Footnote 21: Although Uebbing also reported that there were six social workers in the district at the time that he authored his reports in 2013 and 2014, Aidala found that there were nine social workers servicing students. Either way, the social worker support was woefully inadequate for the student population.

Footnote 22: It is noted that, by the time of McLellan's addendum, the district had implemented a literacy program in kindergarten through grade 6, as well as a "new math program." However, it is unclear if this was additional programming or merely a new pedagogical approach, and, in any event, the results of either program were still unknown by the time of trial.

Footnote 23: At the time of trial, the district did have a state grant for some wrap-around after-school programming.

Footnote 24: The stipulated data reveals an even lower number, with just 44% of students with disabilities graduating in 2014.

Footnote 25: Unlike most of the subject school districts, Utica's student enrollment increased during the stipulated period.